UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
DEBRA A. LEE,                                :
                Plaintiff,              :        05 CIV. 2960 (PAC)
                                             :
    AGAINST -                             :        OPINION AND ORDER
                                             :
AETNA LIFE AND CASALY INSURANCE CO.  :
                Defendant,              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Debra A. Lee ("Lee") seeks a declaratory judgment against Defendant Aetna Life and Casualty Insurance Company ("Aetna") that she is disabled and entitled to benefits pursuant to a long term group disability income policy ("the Plan") issued to Lee's prior employer, Accenture, LLP ("Accenture"). The Employee Retirement Income Security Act of 1974 ("ERISA") governs this action. 29 U.S.C. § 1001 et seq.  On February 13, 2006, the Court denied Lee's motion to apply a de novo standard of review to Aetna's denial of benefits to Lee, and affirmed that the appropriate standard was "arbitrary and capricious" review.  Aetna now moves for summary judgment dismissing Lee's claim.[1]

**RELEVANT FACTS[2]**

**I.  Terms of the Plan**

The Accenture Plan requires that the claimant be "totally disabled" before long term disability benefits can be paid.  Total disability occurs when a worker is "not able, solely because of injury or disease, to work at [her] occupation." Affidavit of

---

[1] In her opposition papers, Lee indicates that she both opposes the motion based on the existence of genuine issues of material fact, and, if the Court finds no such issues, cross-moves for summary judgment.
[2] All facts are drawn from the Plan and the administrative record.  Specific citations will be made only where the record is quoted.

Maryanne M. Barry ("Barry Aff."), Exhibit A at LEE000042.  Inability to work at one's

occupation requires only an inability to perform all the material duties of the occupation.

A period of total disability ends on, inter alia, "the date [she ceases] to be under the care

of a **physician**." Id. at LEE000043 (emphasis in original).  Claims under the Plan "must

give proof of the nature and extent of the loss." Id. at LEE000050.


**II. Aetna's Review**

      Ms. Lee commenced working as a consulting manager for Accenture on

January 7, 2002.  On February 7, 2003, Lee went on a part-time schedule as a result of

her claimed disability.  On or about June 2, 2003, Lee submitted an application for long

term disability benefits with supporting medical documentation from her treating

rheumatologist, Efstathia Chiopelas, M.D. ("Dr. Chiopelas") and her psychiatrist Stanley

Portnow, M.D., claiming to suffer from paresthesia, arthralgia and anxiety.[3]  Aetna

approved the application, and Lee received partial benefits from May 31, 2003 to August

8, 2003,[4] on or about which date she was terminated by Accenture.  After her

termination, Lee received full long term disability benefits through March 10, 2004.

      In September 2003, Lee advised Aetna that she was no longer being

treated by a psychiatrist for any psychological condition, and did not rely on such a

condition as a basis for her disability claim.  Dr. Chiopelas sent updated statements on

Lee's condition in August and September 2003, and on October 13, 2003, Aetna retained

Profile Consultants, Inc. to conduct a personal interview with Lee.  On or about January

---

[3]  Paresthesia refers to a burning or prickling sensation in the hands, arms, legs or feet.  When symptoms of paresthesia are reported, diagnosis is attempted to ascertain the underlying cause which can be, inter alia, a disease or disorder of the brain, spinal cord or peripheral nerves.  Arthralgia is a pain or ache in a joint. Common causes include arthritis, or an injury affecting the tendons or ligaments.
[4]  Benefits were back-dated to the determined start of Lee's disability.

2004, Lee's medical and claim file was forwarded for review to Aetna's in-house Nurse Consultant, Karen Mazza, R.N. ("Nurse Mazza"). The listed "Question" asked whether Lee could return to work in her own occupation, and whether there was "sufficient objective medical documentation to support her inability to [return to work] full time." Barry Aff., Exhibit B, LEE001039. After receiving Nurse Mazza's evaluation, Aetna terminated Lee's benefits by a letter of March 11, 2004.

Lee appealed the termination in a letter dated August 5, 2004, submitting in support a letter by Bruce Solitar, M.D. ("Dr. Solitar") a new rheumatologist treating Lee. In or around October 2004, Lee's medical and claim records were sent for review to Oyebode Taiwo, M.D. ("Dr. Taiwo"), a consulting Medical Director for Aetna, board certified in internal medicine and occupational medicine. The "Referral Question" included requests to comment on whether the included lab results "would support specific disease process," and whether "there are limitations and restrictions supported by the medical information." Id. at LEE000480. The Referral Question also stated: "It does not appear there is specific information to support functional limitations. Please review for functional limitations." Id. On November 3, 2004, Aetna rejected Lee's appeal. This lawsuit followed.

### III.  Relevant Evidence of Disability Provided to Aetna

Lee claims long term disability benefits based on her symptoms of pain, paresthesia, fatigue, arthralgia, sleep disorder, hysteria, and anxiety. In reviewing her claim, Aetna considered all of Lee's submissions, including, inter alia: (1) an interview with Dr. Chiopelas and various reports and records prepared by her; (2) records from Dr. Harold Weinberg, M.D. ("Dr. Weinberg"), her neurologist; and (3) a letter from Dr.

3

Solitar.  Aetna also considered the evaluations of this evidence by Nurse Mazza and Dr.
Taiwo.

*Dr. Chiopelas's Findings*

In her May 30, 2003 APS, Dr. Chiopelas noted Lee's reported symptoms
of "upper and lower extremity paresthesias, arthralgias, anxiety," that "any stress…will
cause anxiety and paresthesias to worsen," and that Lee "require[d] rest periods to avoid
worsening of symptoms." Id. at LEE000753-54.  Dr. Chiopelas's clinical findings were
normal, and diagnostic results, including MRI reports of her brain and lumbar spine, were
within normal limits, except for a positive blood test for "anti-cardiolipin antibodies." Id.
at LEE000753.  The latter were treated with aspirin.  Dr. Chiopelas continued to treat Lee
and after visits on August 14, 2003 and September 10, 2003, again noted Lee's symptoms
and confirmed that her clinical and diagnostic findings were normal except for positive
anti-cardiolipin antibodies, which continued to be treated with aspirin.  The August 14
report also noted that Lee's was an "unclear diagnosis." id. at LEE000703, but that she
was "unable to work with these symptoms." Id.

In a January 22, 2004 interview with an Aetna case manager, Dr.
Chiopelas stated that Lee's symptoms had no clear etiology, or cause,[5] and no
"identifiable triggers," except that stress worsened the symptoms. Id. at LEE000580-81.
Dr. Chiopelas also stated that the abnormal anti-cardiolipin antibodies findings could be
consistent with lupus or multiple sclerosis, but that Lee had no family history of such
ailments.  Dr. Chiopelas also opined that Lee's physical symptoms should not prevent her

---

[5] Dr. Chiopelas's records of office visits on February 14 and March 27, 2003 also noted that Lee's
symptoms have an "unclear etiology," and that her "labs are [normal]." Id. at LEE000710, 717

from working, but that her inability to work was rather due to the anxiety she experienced when the symptoms occurred.

### Dr. Weinberg's Records

Dr. Weinberg's records indicated that MRI's taken of Lee's brain consistently showed "non-specific multiple punctuate foci" within "white matter." Id. at LEE000749.  In a February 5, 2003 letter to Dr. Mitchell Adler, Lee's internist, Dr. Weinberg stated that the reason for this abnormality was not clear, and that "[d]espite her prominent symptoms she has not deteriorated on examination." Id. at LEE000740.  Dr. Weinberg's records also note the symptoms reported by Dr. Chiopelas.

### Dr. Solitar's Letter

The July 26, 2004 letter from Dr. Solitar covered now-familiar territory. Lee's physical examination "was essentially unremarkable" and she has "a generally normal exam."  The Doctor nonetheless noted "significant fatigue" and "significant pain." Id. at LEE001032.  As with the other physicians, Dr. Solitar was unable to provide a definitive diagnosis:

> This patient may have a connective tissue disease or she may have fibromyalgia and chronic fatigue syndrome.  Multiple sclerosis has not been excluded.  Because of her level of fatigue as well as her difficulty concentrating, I do believe she is disabled.

Id.

### Nurse Mazza and Dr. Taiwo's Evaluations

In the analysis section, Nurse Mazza reviewed all of the medical submissions made by Lee in support of her disability claim and noted that all Lee's physical exams, tests and lab results had been normal, except for the elevated anti-cardiolipin antibodies and the "NON-SPECIFIC White Matter Changes" on her MRI. Id.

5

at LEE001040.  She concluded that "[d]ocumentation in file does not substantiate a

psychiatric or physical functional impairment sufficient to prevent claimant from

performing the duties of her own or any reasonable occupation." Id. at LEE001041.

Mazza also stated that additional relevant evidence in making a disability determination

would include "any objective evidence" addressing Lee's functional capacity. Id.

       Dr. Taiwo reviewed the data and medical reports on file.  After his review,

he found that "in the absence of clinical correlation and confirmation by a more specific

test, none of [Lee's abnormal test results] would explain her symptoms or prevent her

from performing sedentary type work." Id. at LEE000483.  Dr. Taiwo also considered

Lee's reported subjective complaints, noting particularly the fatigue and difficulty

concentrating found disabling by Dr. Chiopelas, but concluded that "given her negative

findings on examination despite her complaints and lack of specificity of her diagnoses,

no objective evidence was provided to support physical limitation from her own

occupation categorized as sedentary type work." Id.  Dr. Taiwo suggested that Lee's

condition likely had a "major psychological component" and recommended a review of

her records by a psychologist. Id.[6]


## IV.  Aetna's Grounds for Denial of Benefits

       On March 11, 2004, Aetna notified Lee that it was discontinuing her long

term disability benefits.  Based on the review of Lee's medical records by Nurse Mazza

and the interview with Dr. Chiopelas, Aetna stated:

---

[6] No such review was performed due to Lee's disclaimer of any psychological component to her claim.

> your file does not support a functional impairment which would preclude
> you from performing the essential duties of your own or any reasonable
> occupation on a full time basis.  There is no clinical evidence or
> documentation which supports your inability to return to work in your
> occupation.

Id. at LEE000458-59.  Lee appealed and Dr. Taiwo reviewed the file, including Lee's

new submissions.  On November 3, 2004, after receiving Dr. Taiwo's report, Aetna

advised Lee that it was adhering to its initial decision to terminate her claim.


**DISCUSSION**

**I. Summary Judgment Standard**

A motion for summary judgment shall be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment should only be granted if "the nonmoving party 'has failed to make a

sufficient showing on an essential element of [his] case with respect to which [he] has the

burden of proof'." Berger v. United States, 87 F.3d 60, 64 (2d Cir. 1996) (quoting

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  In ruling on a motion for summary

judgment, the Court must "resolve all ambiguities and draw all factual inferences in favor

of the nonmoving party." McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (citation

omitted).  Summary judgment should not be granted where issues of fact are "genuine,"

and "a reasonable jury could return a verdict for the nonmoving party." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**II. Arbitrary and Capricious Standard of Review**

Under the arbitrary and capricious standard of review, Aetna's decision to terminate benefits is entitled to deference and will not be overturned unless it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Kinstler v. First Reliance Ins. Co., 181 F.3d 243, 249 (2d. Cir 1999). Substantial evidence is "more than a scintilla but less than a preponderance," enough that a reasonable person would find it "adequate to support the conclusion reached." Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995). The evidence of disability that the Court may consider "under the arbitrary and capricious standard is limited to the administrative record." Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995). Evidence outside the administrative record may be admissible, however, to show that the decision-making process was arbitrary and capricious. See id. at 1072 (relying on deposition testimony in finding decision arbitrary and capricious).

Aetna is not required to disprove the possibility that Lee was disabled in order to terminate her benefits; rather, it is Lee's burden to demonstrate her disability under the Plan. See Juliano v. Health Maint. Org. of N.J., 221 F.3d 279 (2d. Cir. 2000). If Aetna and Lee each offer rational, conflicting interpretations of the provisions of the Plan, Aetna's interpretation is controlling. See Pulvers v. First Unum Life Ins. Co., 210 F.3d 89 (2d Cir. 2000). Aetna's structural conflict of interest as the Plan's joint administrator and insurer is a "'factor' in determining whether there has been an abuse of discretion," but "if the administrative interpretation is reasonable, then the conflict is of little, if any, consequence." DeFelice v. American Int'l Life Assur. Co., 112 F.3d 61, 66 (2d Cir. 1997).

8

Upon Lee's appeal of Aetna's termination of benefits, Aetna must provide her with a "full and fair review" of her claim that took "into account all comments, documents, records, and other information submitted by the claimant." 29 CFR §2560.503-1(h).  Further, Aetna may consult only with health care professionals who "ha[ve] appropriate training and experience in the field of medicine involved in the medical judgment." Id.

### III. Aetna's Determination Was Not Arbitrary or Capricious

Aetna's decision to terminate Lee's long term benefits was based on Lee's inability to provide any verifiable evidence substantiating her subjective complaints of pain, fatigue, and anxiety.  The results from her physical examinations or tests did not explain her symptoms, and none of her treating physicians gave a firm diagnosis.  In light of the lack of clinical evidence or actual diagnosis, her doctors' statements of her disability were necessarily based only on those same self-reported symptoms, and amount to no more than their assessment of her credibility.  That assessment carries little weight in supporting a disability claim.  See Maniatty v. Unumprovident Corp., 218 F.Supp.2d 500, 504 (S.D.N.Y. 2002) ("the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator.").  On this record, the Court cannot find that Aetna's decision was "without reason."  It is not arbitrary or capricious for an administrator to require that a claimant present something more than her own unverified subjective complaints in order to qualify for disability benefits. Id.

Lee argues Aetna's decision was arbitrary and capricious because it required her to provide "objective evidence," when the Plan does not contain such a requirement. It is far from clear, however, that the requirement of "proof" of disability, as contained in the Plan, does not implicitly incorporate an objective evidence requirement. See id. ("the plan does state that 'proof' of continued disability must be provided…and the very concept of proof connotes objectivity."). Moreover, the basis for Aetna's decision encompassed the lack of any medical diagnosis as well as the lack of objective evidence. Requiring some substantiation of Lee's subjective complaints falls comfortably within the "proof" requirement.

Alternatively, Lee argues that some cases have held that complaints of pain, standing alone, can be sufficient evidence of disability. None of the cases cited by Lee, however, involved court review of an administrator decision under an arbitrary and capricious review. Rather, those cases addressed the need for a District Court, reviewing decisions de novo, to consider the subjective complaints of a claimant. See Connors v. Connecticut General Life Ins. Co., 272 F.3d 127, 136 (2d Cir. 2001). On arbitrary and capricious review, the consideration of such complaints, including credibility determinations, is within the discretion of the administrator. That Aetna *considered* Lee's subjective complaints as a basis for disability is evident from the fact that, based on those complaints alone, Aetna granted Lee long term disability benefits from August 8, 2003 to March 10, 2004. Aetna terminated benefits when, after a full review of all data, records and medical information, it determined that Lee's subjective complaints were not

credible in light of the absence of any medical diagnosis or corroborating evidence.  That determination was neither arbitrary nor capricious.[7]


### IV.  Aetna Provided a Full and Fair Review of Lee's Claim

Lee makes three arguments that challenge the adequacy of Aetna's review: (1) that Dr. Taiwo, as an internist, did not have the requisite training and experience; (2) that Aetna failed to review all records by accepting the opinions of Dr. Taiwo and Nurse Mazza to the exclusion of those proffered by Lee's doctors; and (3) that Aetna failed to provide a full and fair review by failing to utilize additional, claim-neutral, investigative techniques.  None are persuasive.

As to Dr. Taiwo's qualifications, Lee suggests that because her attending physicians, Drs. Chiopelas and Solitar, were rheumatologists, 29 C.F.R. § 2560.503-1(h)(3)(iii) required that Aetna consult with a rheumatologist.  Lee relies on Robinson v. Metro. Life Ins. Co., No. 05 Civ. 1534, 2006 U.S. Dist. LEXIS 29648 (S.D.N.Y. May 12, 2006), which held that an internist could not give a full and fair review of a neurologist's diagnosis of a disorder supported by objective neurological findings.  That case cannot control here since neither rheumatologist could identify the cause of Lee's symptoms as a rheumatologic condition and so there was no "medical judgment" made within that field of expertise.  Similarly, Aetna was entitled to rely on Dr. Taiwo's opinions rather than those of Lee's physicians, as long as Aetna considered all information submitted by Lee before doing so.  The record clearly indicates that all information was considered.

---

[7] Lee also asserts that Aetna failed to consider her non-physical work requirements and her co-morbid conditions in making its determination.  While characterized as a failure to provide a full and fair review of her claim under 29 CFR §2560.503-1(h)(2), these arguments are better understood as going to the reasonableness of Aetna's termination decision.  The Court need not decide whether Lee's assertions are

Finally, Lee asserts, based on the deposition testimony of Mary Witek, the initial claim decision maker, and Aetna's Internal Policies and Procedure manual, that Lee's claim met Aetna's criteria for utilizing a number of "claim-neutral" investigative tools. Lee also notes that Nurse Mazza noted that a Functional Capacity Examination might be helpful in evaluating the claim. While Aetna's policies may have permitted the use of the investigative tools suggested by Lee in this type of claim, however, they clearly did not *require* them, and Aetna was under no regulatory obligation to employ such tools. Nor has Lee shown any compelling reasons for using them here.[8] Aetna's review was therefore "full and fair" under 29 C.F.R. § 2560.503-1(h).

## CONCLUSION

Defendants' motion is GRANTED and Plaintiff's claims are dismissed in their entirety. The Clerk of the Court is directed to close out this case.

Dated: New York, New York
       May 24, 2007

SO ORDERED

PAUL A. CROTTY
United States District Judge

---

accurate, however, because Aetna's determination that Lee's reported symptoms were not supported rendered consideration of the impact of those symptoms irrelevant.
[8] Given the consistent normality of the examinations performed by Lee's own doctors, her argument that an Independent Medical Examination should have been ordered by Aetna is particularly specious.

12